Zagaroli v. Neill, 2018 NCBC 25.

STATE OF NORTH CAROLINA

CATAWBA COUNTY

PETE ZAGAROLI,

     Plaintiff and Counterclaim
Defendant,

v.

JAMES CLAYTON NEILL;
RICK BERRY; NEILL GRADING
AND CONSTRUCTION COMPANY,
INC.; and RECLAMATION, LLC,

     Defendants and
Counterclaim/Third-Party
Plaintiffs,

v.

BENCHMADE, LLC and DEAN
PRITCHETT,

     Third-Party Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 2635

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1.    **THIS MATTER** is before the Court on the parties' motions for summary judgment. For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** the motions.

> *Law Offices of Matthew K. Rogers, PLLC, by Matthew K. Rogers, for Plaintiff and Third-Party Defendant Benchmade, LLC.*
>
> *Young, Morphis, Bach & Taylor, LLP, by Paul E. Culpepper and Timothy D. Swanson, for Defendants.*

Robinson, Judge.

# I.    INTRODUCTION

2.    This litigation arises out of a failed business relationship among long-time family friends.    Plaintiff Pete Zagaroli ("Plaintiff" or "Zagaroli") approached Defendant James Clayton Neill ("Neill") about the opportunity to redevelop historic mills, including the Hollar Hosiery Mill ("Hollar"), Moretz Mills ("Moretz"), and Lyerly Mills ("Lyerly").    After Zagaroli had failed to close on the purchase of Hollar, Zagaroli approached Neill about purchasing the property.    Discussions ensued between Zagaroli, Neill, Defendant Rick Berry ("Berry"), and other investors sought out by Neill, and Neill formed Hollar Hosiery Investments, LLC ("HHI") to close on the purchase of Hollar.    Zagaroli entered into an agreement with HHI pursuant to which he assigned his rights to purchase Hollar to HHI.    Zagaroli was initially involved in the discussions among the HHI members regarding the development of Hollar, but Zagaroli and HHI had a falling out, and Zagaroli did not participate any further in the Hollar development.

3.    In the midst of the Hollar development, Zagaroli informed Neill about an opportunity to reclaim materials from a historic mill which could be used to manufacture furniture.    This discussion ultimately led to the formation of Reclamation, LLC ("Reclamation"), the initial members of which were Zagaroli, Neill, Berry, and Ryan Lovern ("Lovern").    Initially, Reclamation's business operations included mill redevelopment and furniture manufacturing.

4.    Despite Neill and Berry's capital contributions and loan financing, Reclamation struggled financially.    Lovern voluntarily relinquished her ownership

interest, and Neill and Berry entered into an agreement with Zagaroli and Third-Party Defendant Dean Pritchett ("Pritchett") pursuant to which Neill and Berry's ownership interests in Reclamation would transfer to Zagaroli and Pritchett upon repayment of Neill and Berry's cash advances and of the promissory notes used to fund Reclamation's operations. Zagaroli and Pritchett did not make the repayments, and Reclamation ultimately failed.

## II.    PROCEDURAL HISTORY

5.    The Court sets forth here only those portions of the procedural history relevant to its determination of the motions.

6.    Zagaroli filed his Complaint on October 26, 2015, (ECF No. 1), and his First Amended Complaint on March 21, 2016, (ECF No. 2). The First Amended Complaint asserts claims for (1) breach of fiduciary duty, constructive fraud, and fraud[1]; (2) self-dealing and misappropriation of corporate opportunities; (3) quasi contract and unjust enrichment; (4) breach of contract; (5) violation of the North Carolina Wage and Hour Act (the "Wage and Hour Act"); and (6) defamation. (First Am. Compl. 14, 16−19.)

7.    This action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated April 14, 2016, (ECF No. 4), and assigned to Chief Business Court Judge James L. Gale that same

---

[1] The First Amended Complaint groups these claims together under the heading "First & Second Claims for Relief." (First Am. Compl. 14.)

day, (ECF No. 5).  This case was later reassigned to the undersigned by order dated July 5, 2016.  (ECF No. 19.)

8.     On May 18, 2016, Defendants filed their Answer, Counterclaim, and Third-Party Complaint against Benchmade, LLC ("Benchmade") and Pritchett.  (ECF No. 12.)  Defendants assert counterclaims for (1) a declaratory judgment; (2) conversion; (3) fraud; (4) breach of contract; (5) claim and delivery; and (6) judicial dissolution.  (Answer, Countercl. & Third-Party Compl. 25−30 ["Answer"].)  Defendants assert a third-party claim for conversion against Benchmade and a third-party claim for breach of contract against Pritchett.  (Answer 28−29.)  On December 29, 2016, the Court partially granted Zagaroli's motion to dismiss and dismissed Defendants' fraud claim without prejudice.  (ECF No. 42.)

9.     Zagaroli filed his reply to Defendants' counterclaims on July 18, 2016, (ECF No. 21), and a "revised" reply on October 14, 2016, which Defendants did not contest, (ECF No. 32).

10.    On August 1, 2016, Benchmade filed its Answer to Defendants' third-party complaint.  (ECF No. 22.)

11.    On October 31, 2016, the Court entered default in favor of Defendants against Pritchett.  (ECF No. 37.)

12.    On September 25, 2017, the parties filed their motions for summary judgment.  Defendants move for summary judgment on all of Zagaroli's claims, save and except for his defamation claim.  Zagaroli moves for summary judgment on all of

Defendants' counterclaims. Benchmade moves for summary judgment on Defendants' third-party claim for conversion against it.

13. On November 7, 2017, the Court partially granted Defendants' motion for judgment on the pleadings and dismissed with prejudice Zagaroli's claim for self-dealing and misappropriation of corporate opportunities. (ECF No. 105.) Accordingly, Defendants' motion for summary judgment as to this claim is moot.

14. Save and except for Benchmade's motion for summary judgment, to which Defendants did not respond, the motions have been fully briefed, and the Court held a hearing on the motions on February 8, 2018. The motions are now ripe for resolution.

### III. FACTUAL BACKGROUND

15. The Court does not make findings of fact when ruling on motions for summary judgment. *E.g.*, *In re Estate of Pope*, 192 N.C. App. 321, 329, 666 S.E.2d 140, 147 (2008). The following factual background, taken from the evidence submitted in support of and in opposition to the motions for summary judgment, is intended solely to provide context for the Court's analysis and ruling.

### A. **The Parties**

16. Zagaroli is a resident of Catawba County, North Carolina. (First Am. Compl. ¶ 1; Answer 1, ¶ 1.) Until the end of 2010, Zagaroli was a general contractor who built new construction, renovations, and additions. (First Am. Compl. ¶ 9; Answer 2, ¶ 9; Defs.' Mot. Summ. J. Ex. H, at 25:9–23, ECF No. 93.9 ["Zagaroli

Dep."].)  Zagaroli started Zagaroli Construction Co., Inc. ("Zagaroli Construction") in 1993, which went out of business in 2010.  (Zagaroli Dep. 26:9–11, 28:18–20.)

17.    Neill and Berry are also residents of Catawba County.  (First Am. Compl. ¶¶ 2–3; Answer 1, ¶¶ 2–3.)

18.    Defendant Neill Grading and Construction Company, Inc. ("Neill Grading") is a North Carolina corporation with its principal place of business in Hickory, North Carolina.  (First Am. Compl. ¶ 4; Answer 2, ¶ 4.)  Neill is the secretary of Neill Grading.  (Defs.' Mot. Summ. J. Ex. I, at 10:1, ECF No. 93.10 ["Neill Dep."].)  Ed Neill, who is not a party to this action, is the president and sole owner of Neill Grading.  (Neill Dep. 12:4–6, 14:16–17.)

19.    Reclamation is a North Carolina limited liability company, which was administratively dissolved on February 2, 2017.  (Pl.'s Mot. Summ. J. Ex. 28, ECF No. 102.29.)

**B.    Hollar, Moretz, and Lyerly**

20.    Zagaroli prepared a general business plan for the renovation of historic factories and mills throughout Catawba County, including Hollar, Moretz, and Lyerly (the "Wingfoot Business Plan").  (Zagaroli Dep. 37:4–11, 44:15–17, 45:2–3.)  Zagaroli sought to renovate the old mills and develop the infill properties to attract new businesses.  (Zagaroli Dep. 37:9–20.)  Zagaroli contends, and Defendants deny, that Zagaroli, Neill, Berry, and Neill Grading entered into a partnership to redevelop Hollar, Moretz, and Lyerly.

21.     On three separate occasions between 2006 and July 2009, Zagaroli contracted to purchase Hollar, an abandoned hosiery mill property.  (Zagaroli Dep. 130:20−22, 131:16−19, Ex. 2.)  Zagaroli was unable to close on the property pursuant to the first two contracts, and Zagaroli contracted to purchase Hollar a third time on July 28, 2009.  (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 2, ¶ 6, ECF No. 108 ["Second Zagaroli Aff."]; Zagaroli Dep. Ex. 2.)  After Zagaroli went under contract on July 28, 2009, Zagaroli asked Neill for his help in closing on the purchase, and Neill sought out other investors.  (Neill Dep. 138:8−13.)  Zagaroli then had meetings with Neill, Ed Neill, Berry, Patrick Joyner, and Heather Joyner regarding Hollar, and Neill formed HHI to close on the property.  (Neill Dep. 107:1−4, 130:1−11, 130:20−131:2.)  The original members of HHI were Neill, Ed Neill, Berry, and Laurel Homes, Inc., of which Patrick and Heather Joyner are members.[2]   (Neill Dep. 133:22−134:3, 162:10−13.)

22.     On September 22, 2009, Zagaroli, on behalf of himself and Zagaroli Construction, and HHI entered into an Agreement to Assign Rights to Purchase Real Property and to Purchase Real Property (the "Assignment Agreement").  (Zagaroli Dep. Ex. 2; Answer 21, ¶ 15; Pl.'s Mot. Dismiss, Affirmative Defenses & Revised Answer to Countercls. ¶ 15, ECF No. 32 ["Pl.'s Reply"].)  Pursuant to the Assignment Agreement, Zagaroli assigned his rights to purchase Hollar to HHI, and HHI agreed

---

[2] In addition to HHI, three other limited liability companies were formed in order to syndicate the tax credits from the development of Hollar: Hollar Hosiery Tenant, Hollar Hosiery Development, and Hollar Hosiery Landlord.  (Neill Dep. 32:20−33:24.)  Patrick Joyner and Neill are members of these Hollar entities.  (Neill Dep. 33:25−34:9.)

to purchase Hollar. (Zagaroli Dep. Ex. 2.) The Assignment Agreement provided that "[i]t is the intention of the parties hereto, and a material part of the consideration hereof, to use Zagaroli Construction Co., Inc. to renovate and perform construction on [Hollar]." (Zagaroli Dep. Ex. 2, ¶ 3.) The Assignment Agreement further provided that Zagaroli was to pay the interest incurred by HHI in purchasing Hollar. (Zagaroli Dep. Ex. 2, ¶ 5.) The Assignment Agreement was signed by Neill on behalf of HHI. (Zagaroli Dep. Ex. 2.)

23. At the end of 2010, Zagaroli did not renew his intermediate general contractor's license because he could not afford to, and Zagaroli Construction went out of business. (Zagaroli Dep. 27:19−22, 28:18−20.)

24. At the end of 2010 or early 2011, Zagaroli introduced James Maynard ("Maynard") to the HHI members. (Neill Dep. 91:21−23; Zagaroli Dep. 69:10−14, 69:16−17.) Maynard is a licensed North Carolina architect who owns and operates RedClay, PLLC ("RedClay"). (Defs.' Mot. Summ. J. Ex. N, ¶ 2, ECF No. 93.15 ["Maynard Aff."].) RedClay is a design and development company that specializes in historic adaptive reuse tax credits. (Maynard Aff. ¶ 3.)

25. On July 11, 2011, HHI entered into an agreement with RedClay for architectural and engineering services at Hollar (the "RedClay Agreement").[3] (Defs.' Mot. Summ. J. Ex. A, ECF No. 93.2; Neill Dep. 145:4−9.) Under the agreement, RedClay was to be paid a total of $210,000 (the "A&E Fee"), which amounted to 6%

---

[3] There is a dispute of fact as to whether HHI or Hollar Hosiery Development entered into the RedClay Agreement. However, which Hollar entity entered into the RedClay Agreement is immaterial to the motions for summary judgment.

of the total expected construction cost of $3.5 million and was broken down into three overall components: design, construction documents, and construction administration. (Defs.' Mot. Summ. J. Ex. A, at Defs. 003904, 003913.) Services were to be invoiced based on percentage of completion. (Defs.' Mot. Summ. J. Ex. A, at Defs. 003904.)

26. At or around the same time, RedClay separately agreed to pay Zagaroli a portion of the A&E Fee in exchange for Zagaroli's design and construction administration work. (Zagaroli Dep. 92:24−93:17, 192:11−18, 218:9−13; Neill Dep. 36:12−13; Maynard Aff. ¶ 12.) Pursuant to this agreement, on July 29, 2011, RedClay paid Zagaroli $7,000 out of the A&E Fee for preliminary design consulting work on Hollar. (Second Zagaroli Aff. ¶ 213, Ex. XXX, ECF Nos. 108, 108.3; Zagaroli Dep. 85:12−15; Maynard Aff. ¶ 9.)

27. On or about October 12, 2011, HHI first learned that Zagaroli did not renew his general contractor's license for 2011 and was closing his construction company. (Zagaroli Dep. 28:11−14; Pl.'s Mot. Summ. J. Ex. 14, at Defs. 003885, ECF No. 102.15.) As a result, five days later, HHI and Zagaroli interviewed a number of potential general contractors for Hollar. (Pl.'s Mot. Summ. J. Ex. 14, at Defs. 003886.) At this time, HHI was trying to involve Zagaroli in the Hollar project in some sort of role overseeing the general contractor. (Neill Dep. 67:16−21.) After the interviews, however, the HHI members learned that Zagaroli had been paid by Maynard out of the A&E Fee. (Neill Dep. 67:21−68:5; Pl.'s Mot. Summ. J. Ex. 14, at Defs. 003888.) Thereafter, HHI did not want to discuss anything further with Zagaroli, and Zagaroli

was no longer involved in the Hollar project. (Zagaroli Dep. 192:4–10, 193:14–21, 226:17–20, 228:7–8; Neill Dep. 67:24–68:13, 193:24–194:12.)

28. On May 22, 2012, RedClay paid Reclamation $8,000 out of the A&E Fee for work Zagaroli performed on Hollar pursuant to RedClay's agreement with Zagaroli. (Maynard Aff. ¶ 9; Zagaroli Dep. 85:12–17, 93:18–23.)

29. Sometime in 2012, HHI cancelled the construction administration portion of the RedClay Agreement prior to the work being performed, and the A&E Fee was reduced by $17,500. (Neill Dep. 174:7–25; Maynard Aff. ¶ 10; Second Zagaroli Aff. Ex. 7I, ECF No. 108.7.) Zagaroli contends, and Defendants deny, that Zagaroli is owed $17,500 for work he allegedly performed on Hollar prior to the end of 2011. Zagaroli contends that this money was originally owed by RedClay pursuant to their agreement, but that Neill thereafter promised to pay Zagaroli $17,500. (Zagaroli Dep. 84:18–85:7, 215:14–216:3, 218:9–20.) Neill denies that he or Neill Grading ever promised to pay Zagaroli $17,500. (Neill Dep. 201:4–8.)

30. Ultimately, Neill Grading performed the construction work on Hollar and recognized a loss of $219,031. (Neill Dep. 58:6–8; Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 4, ECF No. 107.3.)

31. In addition to Hollar, Neill Grading was the general contractor for Moretz and Lyerly. (Defs.' Mot. Summ. J. Ex. J, ¶ 11, ECF No. 93.11.) Neill Grading began the work on Moretz and Lyerly in 2013 and early 2014, respectively. (Neill Dep. 53:6, 274:21–23.) Zagaroli contends, and Defendants deny, that the redevelopment opportunities at Moretz and Lyerly were opportunities of the partnership Zagaroli

contends that he and others formed and that Neill and Neill Grading misappropriated these opportunities.

### C. Formation and Operation of Reclamation

32. At the end of 2010, Zagaroli became aware of the JP Stevens Mill in Lincoln County and called Neill about the opportunity to reclaim materials from the mill and use those materials to manufacture furniture. (Zagaroli Dep. 135:4−6; First Am. Compl. ¶ 35; Answer 4, ¶ 35.) Zagaroli told Neill that he did not have the money to pay for the reclamation of the JP Stevens factory materials, and Neill paid $52,019.69 for a crew to disassemble the materials under Zagaroli's supervision. (First Am. Compl. ¶ 36; Answer 4, ¶ 36; Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 1, ECF No. 106.3.) This was the precipitating event that led to the formation of Reclamation on February 18, 2011. (Zagaroli Dep. 135:7−9; First Am. Compl. ¶ 64; Answer 7, ¶ 64.) The initial members of Reclamation were Zagaroli, Neill, Berry, and Lovern, a commercial real estate broker. (First Am. Compl. ¶¶ 63, 65; Answer 7, ¶¶ 63, 65.) Neill, Berry, and Zagaroli each owned thirty percent, and Lovern owned ten percent. (First Am. Compl. ¶¶ 63, 65; Answer 7, ¶¶ 63, 65.) In addition to the money that Neill contributed to Reclamation with respect to JP Stevens, Berry initially contributed $26,000 to Reclamation. (Zagaroli Dep. 119:7−14; Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶ 1, ECF No. 106.2.) Neither Zagaroli nor Lovern were required to put any money into Reclamation for their ownership interests. (Zagaroli Dep. 138:10−12; Defs.' Mot. Summ. J. Ex. K, ¶ 5, ECF No. 93.12.)

33. It is undisputed that, at least at the very beginning of Reclamation's operations, Reclamation's business consisted of both mill redevelopment and furniture manufacturing. (Zagaroli Dep. 51:14–19, 90:13–17, 139:15–19, 142:4–9; Neill Dep. 219:25–220:7, 229:18–230:3, 309:11–23; Defs.' Mot. Summ. J. Ex. K, ¶¶ 6, 9.) There is a dispute of fact as to whether the scope of Reclamation's operations was limited to furniture manufacturing later on.

34. In March 2011, Neill and Berry obtained two $50,000 loans in order to continue funding Reclamation's operations. (Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶ 3; Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 2.) Neill and Berry and their wives personally guaranteed the loans. (Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶ 3; Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 2.)

35. In May 2011, Reclamation agreed to pay Zagaroli $1,000 per week for his furniture-related work. (Zagaroli Dep. 116:11–13, 117:6–22, 186:11–25; Second Zagaroli Aff. ¶ 155.) Zagaroli was in charge of Reclamation's day-to-day operations, and Neill and Berry's participation was limited to weekly meetings. (Defs.' Mot. Summ. J. Ex. K, ¶ 10; Zagaroli Dep. 122:13–21; Second Zagaroli Aff. ¶ 228.) Zagaroli controlled the sales, production, and administration of Reclamation. (Defs.' Mot. Summ. J. Ex. K, ¶ 11.) Zagaroli made the decisions on how to price items and what supplies and inventory Reclamation needed to purchase. (Defs.' Mot. Summ. J. Ex. K, ¶ 11; Zagaroli Dep. 123:3–5.) Zagaroli did not, however, have the authority to sign checks on Reclamation's account. (Defs.' Mot. Summ. J. Ex. K, ¶ 11; Zagaroli Dep. 123:6–17.)

36. In November 2011, Neill and Berry obtained a $125,000 loan in order to continue funding Reclamation's operations. (Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶ 3; Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 2.) Neill and Berry and their wives personally guaranteed the loan. (Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶ 3; Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 2.)

37. Reclamation struggled financially. In or around June 2012, Lovern voluntarily relinquished her ten percent interest in Reclamation. (Defs.' Mot. Summ. J. Ex. K, ¶ 15.)

38. On November 26, 2013, Zagaroli, Neill, Berry, and Pritchett executed a purchase agreement (the "Purchase Agreement") by which Zagaroli and Pritchett proposed to purchase Reclamation from Neill and Berry. (Defs.' Mot. Summ. J. Ex. D, ECF No. 93.5.) The Purchase Agreement set forth the then-outstanding note obligations on the three loans. (Defs.' Mot. Summ. J. Ex. D, at Berry 108.) Section 4 of the agreement provided that:

> [The] parties recognize and accept that [Neill] and [Berry] advanced cash in the respective amounts of $52,019.69 and $60,327.84. Parties [sic] heretofore agree that [Zagaroli and Pritchett] will reimburse [Neill] and [Berry] in a timely manner and on a schedule as mutually agreed upon by the parties for the monies they advanced.

(Defs.' Mot. Summ. J. Ex. D, at Berry 109.) The Purchase Agreement further provided that:

> Upon repayment of the promissory notes, and the cash advancements made by [Neill and Berry] (as set forth in Section 4) 100% ownership of Reclamation, LLC shall be transferred to [Zagaroli] and [Pritchett]. It is agreed by all parties that effective upon execution of this agreement, [Zagaroli] and [Pritchett] will own the name Reclamation, LLC and have the right to any use and benefit of same. . . . If, in the event of non-

payment [sic] of notes and advances or breach of the terms of this purchase agreement by [Zagaroli and Pritchett], [Zagaroli and Pritchett] agree to immediately transfer any right, use, benefit or ownership of the name Reclamation, LLC to [Neill and Berry].

(Defs.' Mot. Summ. J. Ex. D, at Berry 109.) In addition, Section 5 provided that Zagaroli and Pritchett "agree that upon execution of this Purchase Agreement, [Neill and Berry] are no longer responsible for the repayment of the notes, as long as Reclamation, LLC is in operation." (Defs.' Mot. Summ. J. Ex. D, at Berry 109.)

39. As of June 2014, Zagaroli and Pritchett were unable to make the note payments. (Pl.'s Mot. Summ. J. Ex. 4, ¶ 39, ECF No. 102.5; Defs.' Mot. Summ. J. Ex. L, ¶ 15, ECF No. 93.13.) Thereafter, Neill continued to make payments on the notes so that Carolina Trust Bank would not declare the notes in default and seek collection from Neill and his wife as personal guarantors of the loans. (Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 5.) Zagaroli and Pritchett never reimbursed Neill and Berry for their cash advancements. (Defs.' Mot. Summ. J. Ex. L, ¶ 15.)

40. Nevertheless, Zagaroli and Pritchett continued to operate Reclamation. In or around December 2014, Neill Grading agreed to allow Reclamation to perform construction work as a sub-contractor to Neill Grading on the American Honor Ale House, a restaurant and brewery located in Hollar. (First Am. Compl. ¶ 141; Answer 12, ¶ 141.) Despite agreeing to a payment amount for Reclamation to do the work as a sub-contractor, Reclamation had to be paid between $8,000 and $10,000 in excess of the contracted amount in order to finish the agreed-to construction services. (Neill Dep. 293:10−12, 293:20−22; Zagaroli Dep. 178:6−15.) As a result, in June 2015, Neill

Grading accepted some of Reclamation's furniture as compensation for the overage. (Neill Dep. 294:3–10; Zagaroli Dep. 178:15–21; Second Zagaroli Aff. ¶ 380.)

41. On July 24, 2015, Neill and Berry sent a letter to Zagaroli and Pritchett notifying them that they had defaulted under the Purchase Agreement by failing to make the required note payments and repay the cash advancements. (First Am. Compl. Ex. 5.) By this time, Reclamation had failed, and Reclamation was administratively dissolved on February 2, 2017. (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 1, ¶ 13, ECF No. 107.2; Pl.'s Mot. Summ. J. Ex. 28.) Shortly thereafter, Zagaroli went to work for Benchmade. (Zagaroli Dep. 26:14–15.)

## IV.    LEGAL STANDARD

42. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

43. The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the

opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835 (citations omitted).

44. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. However, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C. Gen. Stat. § 1A-1, Rule 56(e).

## V.    ANALYSIS

### A.    Defendants' Motion

45. Defendants move for summary judgment on Zagaroli's claims for breach of fiduciary duty, constructive fraud, and fraud; violation of the Wage and Hour Act; breach of contract; and quasi contract and unjust enrichment.

#### 1.    Breach of Fiduciary Duty, Constructive Fraud, and Fraud

##### a.    Breach of Fiduciary Duty

46. Zagaroli contends that he, Neill, Berry, and Neill Grading partnered to pursue mill redevelopment opportunities at Hollar, Moretz, and Lyerly and, as

partners, owed fiduciary duties to one another. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 6, ECF No. 107.) Zagaroli further contends that Neill, Neill Grading, and Berry breached their fiduciary duties to Zagaroli by misappropriating the redevelopment opportunities at Hollar, Moretz, and Lyerly. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 4–5.)

47. Defendants argue that, to the extent that any partnership related to mill redevelopment existed, such partnership was subsumed into Reclamation when it was formed on February 18, 2011. (Br. Supp. Defs.' Mot. Summ. J. 11–13, ECF No. 93.) As Zagaroli's breach of fiduciary duty claim arises out of events occurring after Reclamation was formed, Defendants contend that Zagaroli's fiduciary duty claim fails because he cannot show the existence of a fiduciary relationship. (Br. Supp. Defs.' Mot. Summ. J. 13–18.)

48. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). The relationship of partners is fiduciary in nature. *Compton v. Kirby*, 157 N.C. App. 1, 15, 577 S.E.2d 905, 914 (2003). Unlike partners, however, members of a limited liability company do not owe fiduciary duties to each other, except a controlling member owes fiduciary duties to minority members. N.C. Gen. Stat. § 57D-3-21(b); *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473, 675 S.E.2d 133, 137 (2009). "A partnership is an association of two or more persons to carry on as co-owners a business for profit[,]" N.C. Gen. Stat. § 59-36(a), "[b]ut any association formed under any other statute of this State . . . is not a partnership under this

Article," *id.* § 59-36(b). Accordingly, if Reclamation, formed under the North Carolina Limited Liability Company Act, encompassed the parties' alleged joint pursuit of mill redevelopment opportunities, then any alleged partnership as to these opportunities ceased to exist upon Reclamation's formation.

**(1) Any alleged partnership was subsumed into Reclamation.**

49. Defendants' evidence tends to show that, at Reclamation's inception, Reclamation's business included both mill redevelopment and furniture manufacturing. (Zagaroli Dep. 51:14−19, 90:13−17, 139:15−19, 142:4−9; Neill Dep. 219:25−220:7, 229:18−230:3, 309:11−23; Defs.' Mot. Summ. J. Ex. K, ¶¶ 6, 9.) Defendants' evidence further indicates that at a meeting sometime during the summer of 2011, all members of Reclamation, including Zagaroli, agreed that Reclamation should focus solely on building furniture because mill redevelopment would require too much capital investment. (Neill Dep. 229:18−230:7, 309:16−23; Defs.' Mot. Summ. J. Ex. K, ¶ 9.)

50. The Court notes that, during Zagaroli's deposition, Zagaroli testified at length that Reclamation was always a mill redevelopment company, not just a furniture manufacturing company, and that Reclamation should have performed the redevelopment work at Moretz and Lyerly. (Zagaroli Dep. 50:24−51:10 ("I think this goes back to our partnership with Reclamation in the fact that these buildings were – the construction work was per- − performed by Neill Grading when it should have really been performed by Reclamation . . . . [E]ven though Neill Grading alone did [Moretz and Lyerly], Reclamation still pursued historic renovations, and, again, you

know, to the demise of Reclamation.  That work could have and should have benefited Reclamation."), 51:14−19 ("Q. And is it your testimony that Reclamation was a development company too?  A. Yes.  Q. And is that from the very beginning of the formation of Reclamation?  A. Yes."), 90:13−17 ("Q. And Reclamation, according to your testimony, it was a development company too?  A. We did.  We approached whatever businesses we could, but it was primarily development – that's – all our marketing stated that – and furniture."), 139:15−19 ("Q. . . . Is it your testimony that Reclamation was always going to be a – a development company, though, as far as redeveloping these historic mills?  A. That and furniture."), 142:4−13 ("Q. Were there specific conversations about Reclamation being involved in redevelopment?  A. Yes.  Q. Okay.  So that's not something you just assumed?  A. No.  And, again, it was put into all our early marketing material.  Q. Did there come a time when that direction shifted some towards more furniture?  A. The entire time I was involved with Reclamation, I pursued all opportunities.").)  Further, Zagaroli testified during his deposition that the purported partnership with Neill to redevelop historic mills was wrapped up into Reclamation when it was formed and that the partnership and Reclamation were "one and the same."  (Zagaroli Dep. 114:4−20, 220:14−17, 221:19−22.)

51.    In opposition to Defendants' motion for summary judgment, Zagaroli submitted a 58-page, 384-paragraph affidavit, which in large part contradicts his prior sworn deposition testimony.  (*See* Second Zagaroli Aff.)  In this affidavit, Zagaroli stated numerous times that he did not "believe," "associate," or "understand"

the opportunities at Hollar, Moretz, and Lyerly to be a part of Reclamation's business. (Second Zagaroli Aff. ¶¶ 128, 171, 297, 353.)

52. "[I]t is well-established that a party opposing a motion for summary judgment cannot create a genuine issue of material fact by filing an affidavit contradicting his prior sworn testimony." *Cousart v. Charlotte-Mecklenburg Hosp. Auth.*, 209 N.C. App. 299, 304, 704 S.E.2d 540, 543 (2011) (quotation marks omitted). "If not for this rule, a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Rider v. Hodges*, 804 S.E.2d 242, 247 (N.C. Ct. App. 2017) (quotation marks omitted).

53. Indeed, Zagaroli attempts to evade this rule by stating in his affidavit that his "[a]nswer to the question that about [sic] the partnership being rolled into Reclamation, LLC and that they were 'one and the same' was a generalization relating to vague [sic] question asked by Paul Culpepper that did not reference any particular time frame." (Second Zagaroli Aff. ¶ 384.) As explained above, Zagaroli testified numerous times that Reclamation's business included mill redevelopment. Moreover, all the other evidence of record is undisputed that Reclamation pursued mill redevelopment opportunities, at least at its inception, and that any partnership that existed between the parties was subsumed into Reclamation. Accordingly, Zagaroli's affidavit contradicting his prior deposition testimony cannot create a genuine issue of material fact regarding the scope of Reclamation's initial business.

54.    Therefore, the Court concludes that there is no genuine issue of material fact that Reclamation's business included mill redevelopment, at least at its very beginning, and, thus, any alleged partnership was incorporated into Reclamation. Against this backdrop, the Court addresses whether Zagaroli has come forward with sufficient evidence of a fiduciary relationship to create a genuine issue of fact.

55.    It is well settled that a manager of a limited liability company owes fiduciary duties to the company, not to the individual members.  N.C. Gen. Stat. § 57D-3-21(b); *Kaplan*, 196 N.C. App. at 474, 675 S.E.2d at 137.  Further, members of a limited liability company do not owe fiduciary duties to each other or to the company, except a controlling member owes fiduciary duties to minority members. *Kaplan*, 196 N.C. App. at 473, 675 S.E.2d at 137.  Here, Neill and Berry each owned a thirty percent interest in Reclamation.

56.    Our Court of Appeals has held "that a minority shareholder exercising actual control over a corporation may be deemed a 'controlling shareholder' with a concomitant fiduciary duty to the other shareholders." *Corwin v. British Am. Tobacco PLC*, 796 S.E.2d 324, 330 (N.C. Ct. App. 2016).  Prior to *Corwin*, North Carolina courts had recognized that individual minority shareholders of a closely-held corporation who act in concert and collectively own the majority interest in the corporation may owe fiduciary duties as the controlling shareholders.  *E.g.*, *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 407, 537 S.E.2d 248, 260 (2000).  North Carolina courts have not, however, recognized that possibility in the context of a limited liability company.  *See Raymond James Capital Partners, L.P. v.*

*Hayes*, 789 S.E.2d 695, 701 (N.C. Ct. App. 2016) ("[A]n exception to [the general] rule is that a controlling shareholder owes a fiduciary duty to minority shareholders. To that end, our courts have extended special protections to minority shareholders in closely held corporations." (first alteration in original) (quotation marks omitted) (citation omitted) (citing *Norman*, 140 N.C. App. at 407, 537 S.E.2d at 260)); *Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *10 (N.C. Super. Ct. Mar. 9, 2016) (stating that the holding in *Norman* has not been extended to minority interest owners in a limited liability company); *Wortman v. Hutaff*, 2013 NCBC LEXIS 47, at *23 (N.C. Super. Ct. Oct. 29, 2013) (finding that two members who each owned a one-third interest were minority interest owners and they "did not owe Plaintiffs fiduciary duties simply because together they owned a majority interest in [the limited liability company] and could out-vote Plaintiffs"); *Blythe v. Bell*, 2013 NCBC LEXIS 17, at *14−18 (N.C. Super. Ct. Apr. 8, 2013) (stating that the *Norman* rule should not apply in the limited liability company context).

57. Assuming, without deciding, that *Corwin* extends to minority interest owners in a limited liability company, there is no evidence that Neill and Berry exercised actual domination and control over Reclamation. The undisputed evidence demonstrates that Zagaroli controlled almost all aspects of Reclamation's business. Although Zagaroli did not have the authority to sign checks on Reclamation's account, Zagaroli made the decisions on a day-to-day basis as to which materials Reclamation should purchase, who needed to be paid, how to price items, and which supplies and

inventory Reclamation needed. Therefore, the Court concludes that Neill and Berry are not controlling members and do not owe fiduciary duties to Zagaroli.

**(2)** **Zagaroli has failed to come forward with sufficient evidence of a partnership to create a genuine issue of fact.**

58. Alternatively, even assuming *arguendo* that the scope of Reclamation's business never included mill redevelopment (an assumption at odds with Zagaroli's sworn testimony), Zagaroli has failed to come forward with sufficient evidence of a partnership to create a genuine issue of fact.

> A partnership is a combination of two or more persons of their property, effects, labor, or skill in a common business or venture, under an agreement to share the profits or losses in equal or specified proportions, and constituting each member an agent of the others in matters appertaining to the partnership and within the scope of its business.

*Compton*, 157 N.C. App. at 10, 577 S.E.2d at 911−12. "A contract, express or implied, is essential to the formation of a partnership." *Wiggs v. Peedin*, 194 N.C. App. 481, 486, 669 S.E.2d 844, 848 (2008) (quoting *Eggleston v. Eggleston*, 228 N.C. 668, 674, 47 S.E.2d 243, 247 (1948)). "A partnership may be inferred from all the circumstances, so long as the circumstances demonstrate a meeting of the minds with respect to the material terms of the partnership agreement." *Compton*, 157 N.C. App. at 11, 577 S.E.2d at 912. Further, it is well settled that "co-ownership and sharing of any actual profits are indispensable requisites for a partnership." *Wiggs*, 194 N.C. App. at 486, 669 S.E.2d at 848.

59. Here, although there is evidence that the parties combined their property, labor, and skill, there is no evidence of an agreement to share profits. Instead, the

evidence indicates that the parties had an understanding that they "would all benefit" from the projects, and that Zagaroli expected to be compensated for his construction and design work on Hollar, Moretz, and Lyerly. For example, in his answer to Defendants' interrogatory regarding the conversations that led Zagaroli to believe that a partnership existed, with respect to Hollar, Zagaroli stated that he

> understood that Neill agreed to partner with Zagaroli in the manner originally described by Zagaroli to Neill, including that Neill arranged for investment and Zagaroli would perform development and construction related services as the means Zagaroli would be compensated. Zagaroli understood the partnership to include Neill making money from the value of the re-developed, income producing property, tax credits and/or sale of the property.

(Zagaroli Dep. Ex. 1, at 6.)

60. In fact, the undisputed evidence demonstrates that Zagaroli performed construction related services on Hollar, including securing the building and repairing the roof, and that HHI paid Zagaroli for this work. (Pl.'s Mot. Summ. J. Ex. 11, ECF No. 102.12; Pl.'s Mot. Dismiss & Mot. J. Pleadings Ex. 4, ECF No. 34.1; Zagaroli Dep. 81:11−21, 82:5−12.) Additionally, Zagaroli testified during his deposition that he had no equity or ownership in the Hollar job—just the potential to do the construction work. (Zagaroli Dep. 69:23−25.)

61. With respect to Moretz and Lyerly, Zagaroli stated that "Neill and Zagaroli's discussions included pursuing historic mill renovation opportunities for [Moretz and Lyerly] for their mutual benefit." (Zagaroli Dep. Ex. 1, at 9, 11.) Zagaroli further stated that "Neill repeatedly represented to Zagaroli that when projects would be completed, Zagaroli would be paid for example from construction

administration services, and/or promising [sic] work including development, design, construction and similar means for compensating Zagaroli for his partnership work." (Zagaroli Dep. Ex. 1, at 12.)

62. That the parties may have pursued mill redevelopment opportunities "for their mutual benefit," and that Zagaroli would derive work on those opportunities for which he would be compensated, does not create a partnership between the parties, with attendant fiduciary duties, as there is no evidence of an agreement, express or implied, to share the profits of the business.

63. In sum, the undisputed evidence tends to show that any alleged partnership between the parties was subsumed into Reclamation, and there is no evidence that Neill and Berry exercised the requisite domination and control over Reclamation such that they owed fiduciary duties to Zagaroli. Alternatively, Zagaroli has failed to come forward with sufficient evidence of a partnership so as to support the existence of a fiduciary relationship between the parties. As Zagaroli has failed to come forward with sufficient evidence of a fiduciary relationship, the Court grants Defendants' motion for summary judgment on Zagaroli's breach of fiduciary duty claim, and this claim is dismissed with prejudice.

### b. Constructive Fraud

64. A constructive fraud claim requires proof of "(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004). A constructive

fraud claim requires the existence of a fiduciary duty. *Brissett v. First Mount Vernon Indus. Loan Ass'n*, 233 N.C. App. 241, 252, 756 S.E.2d 798, 806 (2014).

65. As the Court has concluded that Zagaroli has failed to come forward with sufficient evidence of a fiduciary relationship, the Court likewise grants Defendants' motion for summary judgment on Zagaroli's constructive fraud claim, and this claim is dismissed with prejudice.

### c. Fraud

66. To establish a claim for fraud, Plaintiff must prove "(1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party." *Rider*, 804 S.E.2d at 248 (quoting *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 388 (2007)). Based on the Court's careful review of the record in this action, and the briefs of the parties, Zagaroli has neither alleged nor come forward with any evidence of the essential elements of fraud. Accordingly, the Court grants Defendants' motion for summary judgment on Zagaroli's fraud claim, and this claim is dismissed with prejudice.

### 2. Wage and Hour Act Violation

67. Zagaroli contends that Reclamation failed to pay his $1,000 per week salary in violation of N.C. Gen. Stat. § 95-25.6, which provides, in relevant part, that "[e]very employer shall pay every employee all wages and tips accruing to the employee on the regular payday." N.C. Gen. Stat. § 95-25.6. Defendants contend that all wages

due before October 26, 2013 are barred by the statute of limitations. (Br. Supp. Defs.' Mot. Summ. J. 25.)

68. A claim pursuant to section 95-25.6 is subject to a two-year statute of limitations. N.C. Gen. Stat. § 95-25.22(f). "[T]he statute begins to run on the date the promise is broken." *Kornegay v. Aspen Asset Grp., LLC,* 204 N.C. App. 213, 233, 693 S.E.2d 723, 738 (2010). "[W]hen the party moving for summary judgment pleads the statute of limitations, 'the burden is then placed upon the [non-movant] to offer a forecast of evidence showing that the action was instituted within the permissible period after the accrual of the cause of action.'" *PharmaResearch Corp. v. Mash*, 163 N.C. App. 419, 424, 594 S.E.2d 148, 152 (2004) (second alteration in original) (quoting *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985)).

69. Whether a claim is barred by the statute of limitations is a mixed question of law and fact. *Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 81, 712 S.E.2d 221, 226 (2011). "If a plaintiff's claim is barred by the running of the applicable statute of limitations, summary judgment in favor of a defendant is appropriate." *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 354 (N.C. Ct. App. 2016). "When, however, the evidence is sufficient to support an inference that the limitations period has not expired, the issue should be submitted to the jury." *Baum v. John R. Poore Builder, Inc.*, 183 N.C. App. 75, 81, 643 S.E.2d 607, 611 (2007).

70. Here, Zagaroli filed his Complaint on October 26, 2015. Accordingly, any claim for wages owed prior to October 26, 2013 is barred by the statute of limitations.

In opposition to Defendants' motion, Zagaroli argues that "[t]he evidence will show that when Zagaroli was not paid, there were agreements that such payments would be made in subsequent years, and the obligation was continued into the next year by agreement." (Pl.'s Resp. Defs.' Mot. Summ. J. 21.) Once Defendants, as the movants, demonstrated the absence of a genuine issue of material fact, however, the burden shifted to Zagaroli to come forward with specific facts showing that a genuine issue for trial exists. *In re Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008). Zagaroli has failed to do so.

71. Therefore, the Court concludes that Zagaroli's claim against Reclamation for unpaid wages owed before October 26, 2013 is barred by the statute of limitations. The Court further concludes that genuine issues of material fact exist as to whether an employment relationship existed between Zagaroli and Reclamation and whether Reclamation failed to pay Zagaroli's salary after October 26, 2013. As a result, Defendants' motion for summary judgment on Zagaroli's Wage and Hour Act claim against Reclamation is granted in part as to wages owed before October 26, 2013. Defendants' motion as to wages owed by Reclamation on or after October 26, 2013 is denied.

### 3.    Breach of Contract

72. At the outset, the Court notes that the basis for Zagaroli's breach of contract claim is less than clear. In his response brief in opposition to Defendants' motion for summary judgment, Zagaroli contends that

> [Zagaroli]'s breach of contract claims arise out of promises and contracts relating to (1) [sic] Hollar, Moretz, and Lyerly, which in many respects

mirror the breach of fiduciary duty claims.  Further, [Zagaroli]'s breach of contract includes breach of agreements relating to promises required to form and operate Reclamation, LLC.  [Zagaroli]'s claims include failing to pay for services promised to [Zagaroli] relating to Hollar, but those services are not limited to the contract negotiated between [Neill] and [RedClay].

(Pl.'s Resp. Defs.' Mot. Summ. J. 20.)  In his First Amended Complaint, Zagaroli alleges that "Neill and Berry breached contracts with Zagaroli by failing pay [sic] sufficient money to Reclamation or Zagaroli to pay Zagaroli the $1000.00 per week[,]" that Zagaroli is owed no less than $17,500 for construction administration services Zagaroli performed on Hollar, and that Neill and Berry breached sections 2 and 5 of the Purchase Agreement.  (First Am. Compl. ¶¶ 197, 200−02.)

73.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract."  *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).  A valid contract requires assent, mutuality of obligation, and definite terms.  *Charlotte Motor Speedway, LLC v. Cty. of Cabarrus*, 230 N.C. App. 1, 7, 748 S.E.2d 171, 176 (2013).

### a.     $1,000 per Week

74.     Zagaroli contends that Reclamation's failure to pay Zagaroli $1,000 per week serves as a basis for his breach of contract claim.  The evidence before the Court tends to show that, in May 2011, Reclamation agreed to pay Zagaroli $1,000 per week, (Zagaroli Dep. 116:11−13, 117:6−22, 146:22−147:2, 186:11−25; Second Zagaroli Aff. ¶ 155), and that Reclamation did not pay Zagaroli's salary every week, (Zagaroli Dep. 148:13−15; Defs.' Mot. Summ. J. Ex. K, ¶ 16).  Unlike a claim under section 95-25.6, a claim for breach of contract is subject to a three-year statute of limitations.  N.C.

Gen. Stat. § 1-52(1). A cause of action for breach of contract accrues upon notice of the breach. *N.C. Farm Bureau Mut. Ins. Co. v. Hull*, 795 S.E.2d 420, 422 (N.C. Ct. App. 2016); *Haigh v. Superior Ins. Mgmt. Grp., Inc.*, 2017 NCBC LEXIS 100, at *16 (N.C. Super. Ct. Oct. 24, 2017). As Zagaroli filed his Complaint on October 26, 2015, Zagaroli cannot recover on a breach of contract theory for unpaid salary owed before October 26, 2012. As with Zagaroli's Wage and Hour Act claim, there is a dispute of fact as to whether Reclamation failed to pay Zagaroli's salary after October 26, 2012. Therefore, the Court grants Defendants' motion for summary judgment on Zagaroli's breach of contract claim against Reclamation for unpaid salary owed before October 26, 2012. The Court denies Defendants' motion as to unpaid salary owed by Reclamation on or after October 26, 2012.

### b. $17,500 Construction Administration Fee

#### (1) Zagaroli's alleged construction administration work was performed pursuant to his agreement with RedClay.

75. Zagaroli contends that he is owed no less than $17,500 for construction administration services he allegedly performed for Hollar. Defendants argue that, to the extent that Zagaroli did any construction administration work, such work was performed pursuant to an agreement between Zagaroli and RedClay. (Br. Supp. Defs.' Mot. Summ. J. 23–24.) The Court agrees with Defendants.

76. The evidence is undisputed that, pursuant to the RedClay Agreement, HHI agreed to pay RedClay the A&E Fee, and Zagaroli had a separate agreement with RedClay to be paid a portion of the A&E Fee for Zagaroli's design and construction

administration work.  (Zagaroli Dep. 92:24−93:17, 192:11−18, 218:9−13; Neill Dep. 36:12−13; Maynard Aff. ¶ 12.)  Further, the evidence is undisputed that HHI reduced the scope of work under the A&E Fee such that the fee was lowered by $17,500, which HHI was permitted to do by the express terms of the agreement, and HHI paid the A&E Fee in full.  (Neill Dep. 174:7−25, 203:25−204:7; Maynard Aff. ¶ 10.)

### (2) Enforcement of Neill's alleged promise is barred by the statute of frauds.

77.     Zagaroli nonetheless argues that Neill promised to pay Zagaroli $17,500. (Pl.'s Resp. Defs.' Mot. Summ. J. 20.)  There is a dispute of fact as to whether Neill ever promised to pay Zagaroli $17,500.  Defendants argue, however, that even if Neill so promised, such a promise is a promise to answer for the debt of another and is thus barred by the statute of frauds.[4]  (Br. Supp. Defs.' Mot. Summ. J. 23−25.)

---

[4] Although Plaintiff did not raise this issue in opposition to Defendants' motion for summary judgment, the Court notes that Defendants failed to plead the statute of frauds as an affirmative defense in their answer.  (*See* Answer 16−19.)  "[O]rdinarily, the failure to plead an affirmative defense results in a waiver [of that defense] unless the parties agree to try the issue by express or implied consent."  *News & Observer Publ'g Co. v. McCrory*, 795 S.E.2d 243, 248 (N.C. Ct. App. 2016) (second alteration in original).  However, Defendants expressly raised the statute of frauds in their brief in support of their motion for summary judgment.  *See id.* at 250 ("[I]f an affirmative defense required to be raised by a responsive pleading is sought to be raised for the first time in a motion for summary judgment, the motion must ordinarily refer expressly to the affirmative defense relied upon." (emphasis omitted) (quoting *Dickens v. Puryear*, 302 N.C. 437, 443, 276 S.E.2d 325, 329 (1981))).  Further, Plaintiff had the opportunity to respond and did respond.  *See id.* ("Simply put, the circumstances in *Dickens* indicated that the plaintiff was not prejudiced by the technical failure of the defendant to plead and reference an affirmative defense because it was clear that the plaintiff understood the issue was contested and not only had the opportunity to respond, but had responded." (emphasis omitted)). Therefore, the Court concludes that Defendants' failure to plead the statute of frauds in their answer does not bar its consideration on summary judgment.

78.    Pursuant to N.C. Gen. Stat. § 22-1,

> No action shall be brought whereby to charge an executor, administrator or collector upon a special promise to answer damages out of his own estate or to charge any defendant upon a special promise to answer the debt, default or miscarriage of another person, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party charged therewith or some other person thereunto by him lawfully authorized.

N.C. Gen. Stat. § 22-1. "The general rule under the above statute is that a promise to answer for the debt of another for which the other remains liable, must be in writing." *Parrish Funeral Home, Inc. v. Pittman*, 104 N.C. App. 268, 273, 409 S.E.2d 327, 331 (1991). North Carolina, however, recognizes the "main purpose rule" as an exception to the statute of frauds. *Watson Elec. Constr. Co. v. Summit Cos., LLC*, 160 N.C. App. 647, 653, 587 S.E.2d 87, 93 (2003). Under the main purpose rule, "if it is concluded that the promisor has the requisite personal, immediate, and pecuniary interest in the transaction in which a third party is the primary obligor, then the promise is said to be original rather than collateral and therefore need not be in writing to be binding." *Terrell v. Kaplan*, 170 N.C. App. 667, 670, 613 S.E.2d 526, 528 (2005) (quoting *Burlington Indus., Inc. v. Foil*, 284 N.C. 740, 748, 202 S.E.2d 591, 597 (1981)).

79.    Even assuming *arguendo* that Neill promised to pay Zagaroli $17,500 that was owed by RedClay, such a promise constitutes a promise to answer for the debt of another and must be in writing to be enforceable. Zagaroli contends he is owed $17,500 for services he performed on Hollar, and there is no dispute that any such services were performed prior to the end of 2011. (Zagaroli Dep. 91:22−92:5,

192:4–10, 193:14–21, 217:9–10, 226:17–20, 228:7–8; Neill Dep. 67:24–68:13, 193:24–194:12.) After Neill allegedly promised to pay Zagaroli $17,500, on October 26, 2012, Zagaroli e-mailed an invoice to Neill for that amount. (Second Zagaroli Aff. Exs. 7I–7J; Zagaroli Dep. 85:18–24, 194:11–14, Ex. 4.) The invoice is billed to "Hollar Hosiery, LLC" for "[c]onstruction administration & services rendered[.]" (Zagaroli Dep. Ex. 4.) Any such promise by Neill in October 2012 for services performed by Zagaroli prior to the end of 2011 is not an original promise outside the scope of the statute of frauds. *See Dealers Specialties, Inc. v. Neighborhood Housing Servs., Inc.*, 54 N.C. App. 46, 53, 283 S.E.2d 155, 160 (1981) ("An obligation is original if made *at the time or before the debt is created* and if credit is given in consideration of the promise made by the promissor [sic]." (emphasis added)).

80.    Rather, such a promise, if one was made, was a collateral promise to answer for the debt of RedClay, which must be in writing to be enforceable. *See id.* at 54, 283 S.E.2d at 160 ("If a debt has already been made and the party is already bound under it, and a third party comes in and promises to pay it or to assume the responsibility for it, the third party isn't liable there, because the credit wasn't extended on the basis of that, and that is the promise to answer for the debt, default or miscarriage of somebody else, which has to be in writing before it can be enforced." (quoting *Goldsmith v. Erwin*, 183 F.2d 432, 436 (4th Cir. 1950))). Zagaroli has not come forward with any evidence of a writing wherein Neill promised to pay Zagaroli $17,500. Accordingly, enforcement of any oral promise by Neill to pay Zagaroli $17,500 is barred by the statute of frauds.

### (3) Neill's alleged promise fails for lack of consideration.

81.     Alternatively, the Court concludes that Neill's promise to pay Zagaroli $17,500 is unenforceable as a matter of law for lack of consideration. A contract must be supported by consideration in order to be enforceable. *Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 215 N.C. App. 66, 75, 715 S.E.2d 273, 282 (2011). "A bare promise, made without consideration, creates no legal rights and imposes no legal obligations." *Kingsdown, Inc. v. Hinshaw*, 2016 NCBC LEXIS 15, at *24 (N.C. Super. Ct. Feb. 17, 2016) (quoting *Stonestreet v. S. Oil Co.*, 226 N.C. 261, 263, 37 S.E.2d 676, 677 (1946)); *see also Watson Elec. Constr. Co.*, 160 N.C. App. at 655, 587 S.E.2d at 94 ("Consideration is the glue that binds parties together, and a mere promise, without more, is unenforceable."). Here, Neill's promise to pay Zagaroli $17,500 for prior services Zagaroli allegedly performed on Hollar was not supported by consideration. It is undisputed that the $17,500 was for services allegedly performed prior to 2011, and after 2011, Zagaroli was no longer involved in and performed no further work on Hollar. "[P]ast consideration is not adequate to support a contract." *Kingsdown, Inc.*, 2016 NCBC LEXIS 15, at *24.

82.     In sum, the Court concludes that Zagaroli's alleged construction administration work was performed pursuant to his agreement with RedClay, and enforcement of Neill's alleged promise to pay Zagaroli $17,500 is barred by the statute of frauds. Alternatively, the Court concludes that such a promise is unenforceable for lack of consideration. Accordingly, the Court grants Defendants' motion for

summary judgment on Zagaroli's breach of contract claim to the extent that such claim is based on the $17,500 construction administration fee.

### c. The Purchase Agreement

83. The Court next addresses Zagaroli's claim that Neill and Berry breached the Purchase Agreement. Zagaroli alleges that Neill and Berry breached section 2 of the Purchase Agreement by failing to modify Reclamation's operating agreement. (First Am. Compl. ¶ 201.) Section 2 of the Purchase Agreement provides, in relevant part, that Neill and Berry "agree that they will modify any documents associated with Reclamation, LLC to reflect that [Zagaroli] and [Pritchett] are the new member-managers of Reclamation, LLC and sole owners of the name Reclamation, LLC." (Defs.' Mot. Summ. J. Ex. D, at Berry 109.) The evidence is undisputed, however, that Reclamation did not have a written operating agreement. (Pl.'s Mot. Summ. J. Ex. 4, ¶ 27; Neill Dep. 215:23−216:8.)

84. Zagaroli further alleges that Neill and Berry breached section 5 of the Purchase Agreement by refusing to agree to shut down Reclamation's operations. (First Am. Compl. ¶ 202.) Section 5 of the agreement provides, in relevant part, that "[a]ny shutdown or cessation of operations must be mutually agreed upon by and between [Neill and Berry] and [Zagaroli and Pritchett]." (Defs.' Mot. Summ. J. Ex. D, at Berry 109.) A plain and unambiguous contract must be interpreted as written. *State v. Philip Morris USA Inc.*, 363 N.C. 623, 632, 685 S.E.2d 85, 91 (2009). There is nothing in section 5, or any other provision of the Purchase Agreement, that obligates Neill and Berry to agree to shut down Reclamation's operations. Moreover,

there is no evidence that Zagaroli and Pritchett sought to cease Reclamation's operations and Neill and Berry refused to agree to do so.

85.     Therefore, the Court grants Defendants' motion for summary judgment on Zagaroli's breach of contract claim to the extent that this claim is based on the Purchase Agreement.

### d.     Formation and Operation of Reclamation

86.     Zagaroli also contends that Neill and Berry breached "agreements relating to promises required to form and operate Reclamation, LLC." (Pl.'s Resp. Defs.' Mot. Summ. J. 20.) Zagaroli appears to contend that Neill and Berry failed to make their initial capital contributions to Reclamation, and that Neill and Berry failed to continuously fund Reclamation as needed.

87.     The evidence is undisputed that Neill contributed $52,019.69 to Reclamation in relation to the disassembly and transportation of the JP Stevens factory materials. (Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 1.) The evidence is further undisputed that Berry made his initial contribution of $26,000 to Reclamation. (Zagaroli Dep. 119:7−14; Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶ 1, ECF No. 106.2.) Zagaroli testified during his deposition that, at or around the time of formation, Zagaroli told Berry that Berry needed to contribute $26,000 to Reclamation and Berry contributed that amount to Reclamation. (Zagaroli Dep. 119:2−14, 138:18−23.) Although Zagaroli stated in his affidavit that he does not believe Berry paid any money to Reclamation, (Second Zagaroli Aff. ¶ 149), as discussed above, Zagaroli

cannot create an issue of fact by submitting an affidavit contradicting his own prior sworn deposition testimony.

88. Additionally, Zagaroli stated in his affidavit that he "believed [Berry] and [Neill] were obligated to make sure Reclamation, LLC had sufficient financing, and that they were obliged to use their personal balance sheets and resources to finance Reclamation, LLC's needs and pursuant to a business plan that expected to lose money for the remainder of the year." (Second Zagaroli Aff. ¶ 212.) During his deposition, however, Zagaroli testified that, when Zagaroli told Berry that Berry needed to contribute $26,000, he did not tell Berry that Berry would be required to put in more money later. (Zagaroli Dep. 119:25−120:2; *see also* Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶ 2.) Zagaroli further testified that he never asked Neill and Berry to put in additional capital. (Zagaroli Dep. 155:12−15.) Nevertheless, the undisputed evidence tends to show that Berry ultimately invested a total of $61,457.93 in Reclamation, and both Neill and Berry obtained $225,000 in loans to fund Reclamation's operations, which they and their wives personally guaranteed. (Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶¶ 2−3; Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 2.) In sum, other than Zagaroli's statements in his affidavit—which contradict his prior deposition testimony—the record is devoid of any evidence that Neill and Berry agreed to provide unlimited funding for Reclamation's operations. What the record does show is that Neill and Berry contributed substantial amounts of their personal funds to Reclamation and personally guaranteed substantial loans to make additional cash infusions to the company.

89. Therefore, the Court grants Defendants' motion for summary judgment on Zagaroli's breach of contract claim to the extent that this claim is based on agreements relating to the formation and operation of Reclamation.

### e. Hollar, Moretz, and Lyerly

90. Zagaroli claims that Defendants breached contracts relating to Hollar, Moretz, and Lyerly. As with the other alleged agreements giving rise to Zagaroli's breach of contract claim, these alleged contracts relating to Hollar, Moretz, and Lyerly, and the terms thereof, are equivocal at best. It seems that Zagaroli contends that the parties had an agreement to jointly pursue mill redevelopment opportunities, and that Defendants breached such agreement by misappropriating those opportunities for themselves. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 20.)

91. Defendants argue that this claim must be dismissed because it is a derivative claim that must be brought on behalf of Reclamation and, thus, Zagaroli lacks standing to assert this as an individual claim. (Br. Supp. Defs.' Mot. Summ. J. 23.) The Court agrees with Defendants.

92. It is a well-settled principle of North Carolina law that shareholders of a corporation cannot pursue individual causes of action for wrongs or injuries to the corporation. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997); *Corwin*, 796 S.E.2d at 338. This same standard applies for purposes of determining whether a member of a limited liability company can assert an individual, as opposed to a derivative, claim. *Levin v. Jacobson*, 2015 NCBC LEXIS 111, at *14−15 (N.C. Super. Ct. Dec. 7, 2015); *see* Russell M. Robinson, II, Robinson

on North Carolina Corporation Law § 34.04[5] (7th ed. 2016) ("A derivative action on behalf of an LLC will be governed by essentially the same rules that apply to a derivative action on behalf of a corporation.").

93.     There are two exceptions to the general requirement of derivative claims: (1) when there is a special duty between the wrongdoer and the member; and (2) when the member suffered an injury separate and distinct from the injury suffered by the limited liability company and the other members. *Barger*, 346 N.C. at 658, 488 S.E.2d at 219; *Corwin*, 796 S.E.2d at 338; *Levin*, 2015 NCBC LEXIS 111, at *14; *see* Robinson § 34.04[5] ("[W]hether the member must bring the suit individually or on behalf of the LLC turns on whether the alleged injuries were caused directly to the member or are a consequence of breaches of fiduciary duty that harmed the LLC.").

94.     As discussed above, the undisputed evidence tends to show that, at least initially, Reclamation's business included mill redevelopment.  Further, Zagaroli testified that the mill redevelopment opportunities at Moretz and Lyerly should have been performed by Reclamation.  "Misappropriation of corporate opportunities is logically a derivative claim, but not an individual claim, because the injury is to the corporation, not to an individual shareholder." *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at *38 (N.C. Super. Ct. Oct. 21, 2016) (citing *Meiselman v. Meiselman*, 309 N.C. 279, 307, 307 S.E.2d 551, 567 (1983)).

95.     There is no evidence tending to indicate that Defendants owed Zagaroli a special duty or that Zagaroli suffered a special injury such that Zagaroli may bring an individual claim for misappropriation of the mill redevelopment opportunities.  As

Zagaroli did not make a pre-suit demand on Reclamation, Zagaroli does not have standing to pursue this claim on behalf of Reclamation. N.C. Gen. Stat. § 57D-8-01(a); *Petty v. Morris*, 2014 NCBC LEXIS 67, at *4 (N.C. Super. Ct. Dec. 16, 2014).

96. Therefore, the Court grants Defendants' motion for summary judgment on Zagaroli's breach of contract claim to the extent that this claim is based on agreements relating to Hollar, Moretz, and Lyerly.

### 4. Quasi Contract and Unjust Enrichment

97. Zagaroli's claim for quasi contract and unjust enrichment is based on the services he contends he performed for Hollar, development plans and drawings he provided to Defendants, and unpaid rent. (Pl.'s Resp. Defs.' Mot. Summ. J. 15–20.)

98. "*Quantum meruit* operates as an equitable remedy based upon a quasi contract or a contract implied in law which provides a measure of recovery for the reasonable value of services rendered in order to prevent unjust enrichment." *Ron Medlin Constr. v. Harris*, 364 N.C. 577, 580, 704 S.E.2d 486, 489 (2010) (quotation marks omitted). "In order to recover on a claim of unjust enrichment, a party must prove that it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002).

99. Defendants first argue that Zagaroli's unjust enrichment claim for services performed on Hollar is barred by the express agreement between Zagaroli and RedClay. (Br. Supp. Defs.' Mot. Summ. J. 20.)

100. "[I]t is a well established principle that an express contract precludes an implied contract with reference to the same matter." *Horack v. S. Real Estate Co. of Charlotte, Inc.*, 150 N.C. App. 305, 311, 563 S.E.2d 47, 52 (2002); *see also Plasman*, 2016 NCBC LEXIS 80, at *19 ("[O]ur case law clearly holds that 'an express contract precludes an implied contract with reference to the same matter.'" (quoting *Keith v. Day*, 81 N.C. App. 185, 198, 343 S.E.2d 562, 570 (1986))).

101. Here, the evidence is undisputed that Zagaroli had an express agreement with RedClay to be paid for his work on Hollar, which included construction administration services. Therefore, Zagaroli cannot recover on an implied contract theory for services he performed on Hollar.

102. Next, Zagaroli contends that he provided development plans and drawings to Defendants. (First Am. Compl. ¶ 189; Pl.'s Resp. Defs.' Mot. Summ. J. 18−20.) Defendants argue that Zagaroli's plans and drawings did not confer a benefit on Defendants so as to support an unjust enrichment claim. (Br. Supp. Defs.' Mot. Summ. J. 20−21.) The Court agrees with Defendants.

103. The undisputed evidence tends to show that Defendants did not use Zagaroli's plans or drawings for Hollar, Moretz, or Lyerly. (Defs.' Mot. Summ. J. Ex. J, ¶ 11; Defs.' Mot. Summ. J. Ex. M, ¶ 3, ECF No. 93.14.) Zagaroli's drawings for Hollar could not be used because they did not meet the National Park Service requirements for historic tax credits. (Maynard Aff. ¶ 14.) The undisputed evidence further shows that CBSA Architects, Inc., the architect of record for Moretz, prepared all drawings and plans necessary for the redevelopment of Moretz and did not use

any plans or drawings prepared by Zagaroli. (Defs.' Mot. Summ. J. Ex. O, ¶¶ 2–4, ECF No. 93.16.) Additionally, the undisputed evidence indicates that MHA Works, P.A., the architect of record for Lyerly, prepared all drawings and plans necessary for the redevelopment of Lyerly and such drawings and plans were the original work of MHA Works. (Defs.' Mot. Summ. J. Ex. M, ¶¶ 1–3, ECF No. 93.14.) Neill Grading, as the general contractor for Moretz and Lyerly, followed the plans and specifications drawn by the architects of record, and Zagaroli did not perform any work or services for Neill Grading on Moretz or Lyerly. (Defs.' Mot. Summ. J. Ex. J, ¶ 11.)

104. Additionally, Zagaroli contends that, at Neill's request, Zagaroli prepared development plans for development of a property referred to as "Little Mountain," for which Zagaroli expected to be paid. (Pl.'s Resp. Defs.' Mot. Summ. J. 18.) Little Mountain is a 1,000-acre property located in Denver, North Carolina. (Zagaroli Dep. Ex. 1, at 7, 18.) Little Mountain Farms Limited Partnership, of which Neill and Ed Neill are partners, owns Little Mountain. (Defs.' Mot. Summ. J. Ex. J, ¶ 3; Neill Dep. 14:21–15:14.) The evidence is undisputed that sometime in 2008, Ed Neill told Zagaroli that he wanted to sell Little Mountain for $30,000 per acre and, to obtain such a price, needed development plans demonstrating the various uses of the property. (Zagaroli Dep. 42:12–16; Zagaroli Dep. Ex. 1, at 18.) Thereafter, Zagaroli worked on development plans with Neill, Ed Neill, and a well-known architect named Beau Welling. (Zagaroli Dep. 42:20–25; Zagaroli Dep. Ex. 1, at 18.) The evidence is undisputed that Zagaroli, Neill, and Ed Neill agreed that Zagaroli was to receive a percentage of the sales price as compensation for his work on Little Mountain,

(Zagaroli Dep. Ex. 1, at 7, 18; Defs.' Mot. Summ. J. Ex. J, ¶ 5); however, the property never sold and a development deal was never reached, (Defs.' Mot. Summ. J. Ex. J, ¶ 6; Zagaroli Dep. 42:12–15).  As there is an express agreement relating to the development drawings Zagaroli prepared for Little Mountain, Zagaroli cannot recover for such work under an implied contract theory.

105.  Third and last, Zagaroli contends that, pursuant to N.C. Gen. Stat. § 42-4, he is entitled to unpaid rent for Reclamation's use of two buildings referred to as the "Zag Building" and the "Conover Building."  (Pl.'s Resp. Defs.' Mot. Summ. J. 17.)

106.  Zagaroli acquired the Zag Building on June 28, 2005 and the Conover Building on May 26, 2006.  (Defs.' Mot. Summ. J. Ex. F, ECF No. 93.7.)  The evidence tends to indicate that Reclamation operated out of the Zag Building and stored materials in both the Zag Building and the Conover Building.  (Second Zagaroli Aff. ¶¶ 140–41; Zagaroli Dep. 114:13–16.)  On May 31, 2011, Zagaroli sold both buildings to his parents.  (Defs.' Mot. Summ. J. Ex. G, ECF No. 93.8.)

107.  Defendants argue that Zagaroli does not have standing to pursue unpaid rent that accrued after he sold the properties to his parents on May 31, 2011, and that a claim for unpaid rent that accrued prior to May 31, 2011 is barred by the statute of limitations.

108.  Section 42-4 provides that "[w]hen any person occupies land of another by the permission of such other, without any express agreement for rent, or upon a parol lease which is void, the landlord may recover a reasonable compensation for such occupation[.]"  N.C. Gen. Stat. § 42-4.  The record is undisputed that, as of May 31,

2011, Zagaroli was not the owner of the Zag Building or the Conover Building. (Defs.' Mot. Summ. J. Ex. G.)  Therefore, Zagaroli only has standing to bring a claim for rent owed from February 18, 2011, the date on which Reclamation was formed, to May 31, 2011, the date on which Zagaroli sold the properties to his parents.

109.    A claim for reasonable compensation for occupation of one's property under section 42-4 is subject to a three-year statute of limitations.  N.C. Gen. Stat. § 1-52(2); *Simon v. Mock*, 75 N.C. App. 564, 567, 331 S.E.2d 300, 302 (1985).  "[A] cause of action for rent under [§ 42-4] must accrue continually, for each day the property is occupied." *Simon*, 75 N.C. App. at 567, 331 S.E.2d at 302.

110.    Here, Zagaroli filed his Complaint on October 26, 2015.  Accordingly, any claim for rent owed prior to October 26, 2012 is barred by the statute of limitations. As Zagaroli only has standing to pursue rent owed prior to May 31, 2011, Zagaroli's claim for unpaid rent must fail.

111.    In sum, Zagaroli has failed to come forward with sufficient evidence that he conferred a benefit on Defendants so as to create a genuine issue of material fact.  As a result, Defendants' motion for summary judgment on Zagaroli's unjust enrichment claim is granted, and this claim is dismissed with prejudice.

### B.    Plaintiff's Motion

112.    Zagaroli moves for summary judgment on all of Defendants' counterclaims. The Court addresses each in turn.

## 1.     Declaratory Judgment

113.    Defendants seek a declaratory judgment that Neill, Berry, and Zagaroli each own a one-third ownership interest in Reclamation, and that Neill and Berry own the name Reclamation, LLC.[5]  (Answer 25−26; Br. Opp'n Pl.'s Mot. Summ. J. 4, ECF No. 106.)  Zagaroli argues that he is entitled to summary judgment on Defendants' declaratory judgment counterclaim because Neill and Berry did not perform as required to obtain their membership interests in Reclamation.  (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 12−14, ECF No. 102.)

114.    First, N.C. Gen. Stat. § 57D-3-01(c) expressly provides that, "[t]o be a member a person need not make or have the obligation to make any contributions to the LLC[.]"  N.C. Gen. Stat. § 57D-3-01(c).  Second, as discussed above with respect to Zagaroli's breach of contract claim, the evidence is undisputed that Neill and Berry made their capital contributions to Reclamation in exchange for their ownership interests, and there is no evidence that Neill or Berry were required to provide any other consideration in exchange for their ownership interests.  (Br. Opp'n Pl.'s Mot. Summ. J. Ex. A, ¶ 1; Br. Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 1; Zagaroli Dep. 119:7−14.)  Third, it is undisputed that Neill signed Reclamation's articles of organization in the capacity of a member, (Neill Dep. 226:2−4), and, thus, became a member on February

---

[5] In their counterclaim, Defendants request a declaratory judgment that Neill and Berry each own a fifty percent ownership interest in Reclamation, and that Neill, Berry, and Zagaroli each own a one-third economic interest in Reclamation.  In their brief in opposition to Plaintiff's motion, however, Defendants conceded to a declaratory judgment that Neill, Berry, and Zagaroli each own a one-third ownership interest in Reclamation.  (Br. Opp'n Pl.'s Mot. Summ. J. 4.)

18, 2011, *see* N.C. Gen. Stat. § 57D-3-01(a)(1) (providing that a person executing the articles of organization in the capacity of a member becomes a member at the time the articles of organization become effective under section 55D-13); *id.* § 55D-13 (providing that a document accepted for filing is effective on the date it is filed).

115. The undisputed evidence tends to show that Neill, Berry, and Zagaroli each owned a thirty percent interest in Reclamation and Lovern owned a ten percent interest in Reclamation. (First Am. Compl. ¶¶ 63, 65; Answer 7, ¶¶ 63, 65.) Lovern relinquished her ten percent interest in June 2012. (Defs.' Mot. Summ. J. Ex. K, ¶ 15.) Thereafter, on November 26, 2013, Neill, Berry, Zagaroli, and Pritchett executed the Purchase Agreement. (Defs.' Mot. Summ. J. Ex. D.) Pursuant to this agreement, upon repayment of the promissory notes and Neill and Berry's cash advancements, Neill and Berry's ownership interests in Reclamation would have transferred to Zagaroli and Pritchett. (Defs.' Mot. Summ. J. Ex. D, at Berry 109.) It is undisputed, however, that Zagaroli and Pritchett did not repay either the promissory notes or the cash advancements and, as a result, Neill and Berry retained their ownership interests. (Pl.'s Mot. Summ. J. Ex. 4, ¶ 39; Defs.' Mot. Summ. J. Ex. L, ¶ 15.) Additionally, the Purchase Agreement expressly provided that upon its execution, Zagaroli and Pritchett would own the name Reclamation, but "[i]f, in the event of non- payment [sic] of notes and advances or breach of the terms of this purchase agreement by [Zagaroli and Pritchett], [Zagaroli and Pritchett] agree to transfer any right, use, benefit or ownership of the name Reclamation, LLC to" Neill and Berry. (Defs.' Mot. Summ. J. Ex. D, at Berry 109.)

116. Therefore, the Court concludes that there is no genuine issue of material fact that Neill, Berry, and Zagaroli each own a one-third ownership interest in Reclamation, and Neill and Berry own the name Reclamation, LLC. Accordingly, the Court denies Plaintiff's motion for summary judgment on Defendants' declaratory judgment counterclaim and enters judgment in favor of Defendants against Plaintiff on this claim. *See Erthal v. May*, 223 N.C. App. 373, 387, 736 S.E.2d 514, 523 (2012) ("Rule 56 does not require that a party move for summary judgment in order to be entitled to it. Thus, the trial court can grant summary judgment against the moving party." (citations omitted) (quotation marks omitted)).

### 2. Conversion

117. Reclamation contends that Zagaroli converted at least $65,721.15 by forging Neill's name on checks drawn on Reclamation's account, as well as numerous pieces of Reclamation's machinery and equipment. (Answer 26−27.)

118. Conversion is (1) an unauthorized assumption and exercise of the right of ownership over goods or personal property belonging to another, and (2) a wrongful possession or conversion, regardless of the subsequent application of the converted property. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E2d 744, 747 (2012).

119. Zagaroli testified during his deposition that Neill authorized Zagaroli to sign Neill's name on Reclamation checks. (Zagaroli Dep. 164:23−165:1, 172:24−173:9.) Defendants have come forward with evidence that Neill did not give Zagaroli permission to sign Neill's name on Reclamation checks. (Neill Dep.

265:10−17.) Therefore, the Court concludes that there is a genuine issue of material fact as to whether Zagaroli converted Reclamation's funds.

120. As to the machinery and equipment, Zagaroli argues that Defendants failed to make a demand for the return of the equipment. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 24.) Defendants contend that Zagaroli wrongfully took and sold the machinery and equipment, thereby dispensing with the demand requirement. (Br. Opp'n Pl.'s Mot. Summ. J. 13.) Alternatively, Defendants contend that they did make a demand. (Br. Opp'n Pl.'s Mot. Summ. J. 13.)

121. "[W]hen the defendant *lawfully* obtains possession or control and *then* exercises unauthorized dominion or control over the property, demand and refusal become necessary elements of the tort." *Stratton*, 211 N.C. App. at 83, 712 S.E.2d at 227. Here, Zagaroli lawfully came into possession of Reclamation's machinery and equipment as he was in charge of Reclamation's day-to-day operations and Reclamation stored the equipment in the Zag and Conover Buildings previously owned by Zagaroli. The evidence tends to indicate that Zagaroli sold the machinery and equipment in July 2017—more than one year after Defendants filed their counterclaims. (Pl.'s Mot. Summ. J. Ex. 4, ¶¶ 55−56.) Thus, Defendants were required to make a demand for the return of the machinery and equipment prior to asserting their claim.

122. There is a genuine issue of material fact as to whether Defendants made a demand for the return of the machinery and equipment and whether Zagaroli refused to return the property. (Zagaroli Dep. 180:22−181:7; Neill Dep. 273:19−274:3; Br.

Opp'n Pl.'s Mot. Summ. J. Ex. B, ¶ 3.)  Therefore, the Court denies Plaintiff's motion for summary judgment on Reclamation's conversion counterclaim.

### 3.    Breach of Contract

123.    Defendants contend that Zagaroli breached the Purchase Agreement by failing to repay the promissory notes and Neill and Berry's cash advances.  (Answer 28.)  Zagaroli first contends that he was not obligated under the express terms of the Purchase Agreement to repay the promissory notes.  (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 17–18.)  Conversely, Defendants contend that Zagaroli was obligated under the Purchase Agreement to repay the promissory notes.  (Br. Opp'n Pl.'s Mot. Summ. J. 9.)

124.    "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *Philip Morris USA Inc.*, 363 N.C. at 631, 685 S.E.2d at 90.  "Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." *42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 513, 722 S.E.2d 1, 8 (2012) (quoting *Jones v. Casstevens*, 222 N.C. 411, 413–14, 23 S.E.2d 303, 305 (1942)).  The Court's task is to harmonize and give effect to all clauses, if possible. *Philip Morris USA Inc.*, 363 N.C. at 632, 685 S.E.2d at 91.  The contract is to be construed consistently with reason and common sense. *Variety Wholesalers, Inc.*, 365 N.C. at 525, 723 S.E.2d at 748.  When a contract is plain and unambiguous, the Court can determine the parties' intent as a matter of law.  *42 E., LLC*, 218 N.C. App. at

513, 722 S.E.2d at 8. If a contract is ambiguous, however, interpretation of the contract is a question of fact for the jury. *Variety Wholesalers, Inc.*, 365 N.C. at 525, 723 S.E.2d at 748. An ambiguity exists when the effect of provisions is uncertain or capable of several reasonable interpretations. *Id.*

125. Here, the Purchase Agreement sets forth the outstanding note obligations under the heading "Repayment of Note Obligations" without expressly providing who is responsible for making the payments. (Defs.' Mot. Summ. J. Ex. D, at Berry 108.) The agreement further states that "[u]pon repayment of the promissory notes" and cash advancements, 100% ownership of Reclamation shall be transferred to Zagaroli and Pritchett. (Defs.' Mot. Summ. J. Ex. D, at Berry 109.) The agreement states that Zagaroli and Pritchett "agree that upon execution of this Purchase Agreement, [Neill and Berry] are no longer responsible for repayment of the notes," (Defs.' Mot. Summ. J. Ex. D, at Berry 109), and although the agreement expressly provides that Zagaroli and Pritchett are to repay the cash advancements, it does not expressly provide that Zagaroli and Pritchett are to repay the promissory notes.

126. The Court cannot conclude as a matter of law that Zagaroli and Pritchett had no obligation to repay the promissory notes. The agreement expressly provides that Neill and Berry are no longer responsible for repaying the notes while failing to provide who is responsible therefor. As the agreement states that Zagaroli and Pritchett were to be the sole owners of Reclamation upon repayment of the notes and cash advancements, and that Zagaroli and Pritchett were to repay the cash

advancements, the agreement can reasonably be interpreted as obligating Zagaroli and Pritchett to repay the notes and, therefore, is ambiguous.

127. Zagaroli next contends that Defendants rescinded the Purchase Agreement when they sent Zagaroli and Pritchett a letter of default and, as a result, Defendants cannot recover damages for breach of the agreement. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 19–20.) This argument is without merit. Defendants' letter of default informed Zagaroli and Pritchett that they failed to make the required payments under the Purchase Agreement and, as a result, Zagaroli and Pritchett's rights in Reclamation had ceased. (First Am. Compl. Ex. 5.) The letter does not state that Defendants are rescinding the agreement or anything to that effect. Rather, the letter expressly states that Neill and Berry "would like to work with [Zagaroli] to agree upon payment terms for the notes and reimbursement of all cash advanced by [Neill and Berry] on behalf of Reclamation, LLC, as is required under the Agreement." (First Am. Compl. Ex. 5.)

128. In sum, the Court concludes that genuine issues of material fact exist as to whether Zagaroli was obligated to repay the promissory notes and, as such, Plaintiff's motion for summary judgment on Defendants' breach of contract counterclaim is denied.

### 4. Claim and Delivery and Judicial Dissolution

129. Plaintiff moves for summary judgment on Defendants' counterclaims for claim and delivery and judicial dissolution of Reclamation. In their response brief in opposition to Plaintiff's motion for summary judgment, Defendants state that they

are no longer pursuing these counterclaims.  (Br. Opp'n Pl.'s Mot. Summ. J. 7 n.1, 12 n.2.)    Accordingly, Plaintiff's motion for summary judgment on Defendants' counterclaims for claim and delivery and judicial dissolution is granted, and these claims are dismissed with prejudice.

### C.    Benchmade's Motion

130.    Benchmade moves for summary judgment on Defendants' third-party conversion claim against it.  Defendants did not file a response in opposition to Benchmade's motion and, at the hearing on the motions, Defendants stated that they are not pursing a conversion claim against Benchmade.  Therefore, Benchmade's motion for summary judgment on Defendants' third-party claim for conversion is granted, and this claim is dismissed with prejudice.

## VI.    CONCLUSION

131.    For the foregoing reasons, the Court hereby **ORDERS** as follows:

> A.    The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's breach of fiduciary duty, constructive fraud, and fraud claims, and these claims are dismissed with prejudice.
>
> B.    The Court **DENIES** Defendants' motion for summary judgment on Plaintiff's Wage and Hour Act claim to the extent this claim is based on unpaid salary owed on or after October 26, 2013, and this claim shall go forward to trial.  The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's Wage and Hour Act claim to the

extent this claim is based on unpaid salary owed before October 26, 2013.

C.   The Court **DENIES** Defendants' motion for summary judgment on Plaintiff's breach of contract claim to the extent this claim is based on unpaid salary owed on or after October 26, 2012, and this claim shall go forward to trial.  The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's breach of contract claim in all other respects.

D.   The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's quasi contract and unjust enrichment claim, and this claim is dismissed with prejudice.

E.   The Court **DENIES** Plaintiff's motion for summary judgment on Defendants' declaratory judgment counterclaim, and judgment is entered in favor of Defendants against Plaintiff on this claim.  The Court hereby **DECLARES** that Neill, Berry, and Zagaroli each own a one-third ownership interest in Reclamation, and Neill and Berry own the name Reclamation, LLC.

F.   The Court **DENIES** Plaintiff's motion for summary judgment on Defendants' conversion counterclaim, and this claim shall go forward to trial.

G. The Court **DENIES** Plaintiff's motion for summary judgment on Defendants' breach of contract counterclaim, and this claim shall go forward to trial.

H. The Court **GRANTS** Plaintiff's motion for summary judgment on Defendants' claim and delivery counterclaim, and this claim is dismissed with prejudice.

I. The Court **GRANTS** Plaintiff's motion for summary judgment on Defendants' judicial dissolution counterclaim, and this claim is dismissed with prejudice.

J. The Court **GRANTS** Third-Party Defendant Benchmade's motion for summary judgment on Defendants' third-party conversion claim, and this claim is dismissed with prejudice.

**SO ORDERED**, this the 28th day of March, 2018.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases